IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 4, 2020 Session

**STATE OF TENNESSEE v. TORIJON COPLIN**

**Appeal from the Circuit Court for Madison County**
**No. 19-83     Roy B. Morgan, Jr., Judge**

————————————————————

**No. W2019-01593-CCA-R3-CD**

————————————————————

A jury convicted the Defendant, Torijon Coplin, of aggravated assault and tampering with evidence, and he received an effective sentence of four years suspended to supervised probation after eleven months and twenty-nine days of service. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions and argues the trial court erred in charging the jury as to criminal responsibility. Because the criminal responsibility charge did not include the natural and probable consequences requirement and because the error was not harmless beyond a reasonable doubt as to the tampering with evidence conviction, we reverse the conviction for tampering with evidence and remand for further proceedings. The judgments are otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN J., joined. J. ROSS DYER, J., filed a separate opinion concurring in part and dissenting in part

Jeremy Epperson (at trial), District Public Defender; and Brennan M. Wingerter (on appeal), Assistant Public Defender – Appellate Division, for the appellant, Torijon Coplin.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody Pickens, District Attorney General; and Lee R. Sparks, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

On October 6, 2018, the Defendant and Mr. Djuan Manning, the co-defendant, (collectively, "the Defendants") followed the vehicle of the victim, Mr. Joshua Anderson, and proceeded to shoot at the victim and take his vehicle when he fled on foot. The Defendants were charged with aggravated assault and tampering with evidence, *see* T.C.A. §§ 39-13-102, -16-503(a)(1), and proceeded to a joint trial, where the victim testified that the Defendants followed him, that they both shot at him, and that he returned fire in self-defense. The co-defendant testified that the victim initiated the gunfire, that the Defendant never had a gun, and that the co-defendant only returned fire in self-defense. The victim's weapon was recovered, but no weapon was recovered from the Defendant or co-defendant.

The victim testified that he had previously dated the Defendant's girlfriend, Ms. Frakia Robinson, and that he went to high school with the co-defendant. Approximately four or five months prior to the shooting, the victim and the Defendant, who worked together, got into a fight at work.

Around 5:00 p.m. on October 6, 2018, the victim drove past the Defendants in his 2010 white Dodge Charger. The Defendant was driving a silver Altima and was stopped in a turn lane, and the co-defendant, who was in the passenger seat, stuck his head out of the window as the victim drove past. After passing the Defendants, the victim noticed the Defendant had pulled out of the turn lane and was following him. The victim called 911 when the Defendant began following him.[1] The Defendants displayed a gun. The victim testified that he turned onto another street to determine if he was being followed, and the Defendants turned behind him. According to the victim, the Defendant then fired a shot which penetrated the victim's vehicle. The victim stopped his vehicle, exited, and fired approximately fourteen shots as he ran from the scene. The victim hid temporarily in an open van before entering a nearby home. The victim left his firearm in the van because he did not want to alarm the homeowners. The victim used a .40 caliber Taurus firearm, for which he held a concealed carry permit, during the shooting. He admitted that prior to October 6, 2018, Ms. Robinson had obtained an order of protection against him.

---

[1] The victim also testified that before calling 911, he personally recorded the defendants as they followed him and he provided this video to police. However, the State clarified that it was unable to view the victim's recording during the course of the investigation.

During the victim's testimony, the State introduced into evidence the victim's 911 call and security footage that captured the shooting. The victim informed the operator that he believed the Defendants had a gun, he provided his location, and he remained on the phone as the shooting began. The victim identified the gunshots heard in the recording. The security footage showed the two vehicles coming to a stop so that a tree blocked a direct view of the driver's side area of the Defendants' vehicle. The video showed the victim exit his car facing the Defendants' vehicle, fire, and flee. The video showed the Defendant's door opening and the Defendant's vehicle beginning to roll forward, showed the co-defendant entering the victim's vehicle, and showed the Defendant returning to his vehicle. The victim's vehicle then made a U-turn and both vehicles driving away.

Approximately thirty minutes after the shooting, the victim provided a statement to law enforcement. The victim informed police that he returned fire and indicated his firearm was in the van where he hid after fleeing the scene. The victim acknowledged at trial that his statement to police that the Defendant initiated the gunfire by getting out of his vehicle and shooting was inconsistent with the security footage. He clarified that the Defendant actually fired from inside his vehicle and explained that at the time he provided the statement, he was upset and afraid.

Several of the responding officers from the City of Jackson Police Department also testified. Upon his arrival at the scene approximately three to ten minutes after the emergency call, Officer Travis McNatt located the victim at a nearby home and described the victim as "very distraught," "worked up," "visibly offended," "obviously mad," and "shaken." He learned that the victim returned fire during the shooting and confirmed the victim had a concealed carry permit. However, Officer McNatt was unaware of the order of protection filed against the victim, which prohibited him from carrying a firearm at the time of the shooting.

Officer Michael Thomas obtained a written statement from the victim and located the victim's vehicle approximately one hundred yards behind the home of Ms. Sharon Sanders, the co-defendant's mother. Officer Thomas testified that both the Defendants' and the victim's vehicles were seized and processed into evidence. In numerous photographs which were entered into evidence, Officer Thomas identified multiple bullet holes, strikes, and skips which hit the rear of the victim's vehicle. He further identified "a shot that penetrated through the front of the [victim's vehicle] on the roof, and . . . another one that came out the windshield -- or struck the windshield, and . . . another exit . . . from the door." Officer Thomas explained rods were used to help determine the trajectory and angle of the bullets that hit the victim's vehicle. The investigation revealed that the bullets fired at the victim's vehicle travelled through the interior paneling, the window, the interior of the roof, "the front left A-frame on the driver's side," and "the

headrest and . . . into the back of the front seat." Officer Thomas could not determine the exact caliber of the bullets which hit the victim's vehicle but opined they were likely nine millimeter or .40 caliber. The Defendants' vehicle also suffered damage from gunshots. Officer Thomas identified certain bullet holes in the front of the Defendants' vehicle that were likely caused by gunshots fired by the co-defendant. Officer Thomas could not determine from the physical evidence which party fired first.

Officer Thomas stated that over twenty .40 caliber bullet casings were recovered from the scene. He testified that the only firearm that was recovered during the investigation was the victim's .40 caliber firearm. He rejected the possibility that the victim shot his own vehicle, noting that "the location of the damage would not — especially with the video, would not show that [the victim] was shooting the rear of his own vehicle." Officer Thomas acknowledged the inconsistency between the victim's statement and the security footage, noting the Defendant did not exit his vehicle and start shooting at the victim as the victim had said in his statement. Officer Dennis Ballentine located the victim's firearm in the van. Officer Daniel Melson collected the firearm, a Taurus .40 caliber weapon, and identified it at trial. The victim's firearm and five rounds were entered into evidence.

Investigator Michael Byrd participated in locating the Defendants after the shooting. A concerned citizen's call advised that "some subjects" ran into Ms. Sanders's home. Investigator Byrd set up a perimeter around the home and spoke with Ms. Sanders, who informed him the Defendants were inside. The Defendants surrendered to law enforcement within seconds, and Ms. Sanders consented to a search of the home. No firearms were located. The silver Altima driven by the Defendant was located in Ms. Sanders's driveway. The victim's vehicle was found on a dead-end street which ran behind the Defendant's home. Investigator Thomas acknowledged that the victim's vehicle was parked in the open and not concealed in a garage. It had not been altered or camouflaged.

The State then rested its case, and the trial court denied the Defendants' motions for a judgment of acquittal. The Defendant waived his right to testify, and the co-defendant testified on his own behalf.

The co-defendant testified that the Defendant was not armed and that the co-defendant only fired a weapon in self-defense after the victim shot at the Defendants. He denied knowing the victim or attending high school with him. According to the co-defendant, prior to the shooting, the Defendants left Ms. Sanders's home to go to Sonic. The Defendant was driving Ms. Robinson's vehicle, and the co-defendant rode in the passenger seat. The co-defendant denied following the victim, stating instead that the victim saw the Defendants as the two vehicles passed each other on opposite sides of the

street. The victim then made a U-turn and sped in front of the Defendants' vehicle as they slowed for a red light. The victim turned left in front of the Defendants, and the Defendants also turned. The co-defendant explained they were merely driving in the same direction and not following the victim. The victim then stopped his vehicle, and the Defendant honked his horn. The victim "hesitated for a few seconds," opened his door, and began shooting at the Defendants.

The co-defendant saw a gun in between the seats and returned fire in an effort to get the victim "off our back." The co-defendant pulled himself out of the window and shot, hitting the hood of the Defendants' car. The co-defendant fell out of the car window and hit his head. The co-defendant explained that he then took the victim's vehicle because he was worried that the victim, who was on the telephone, was planning to return with "backup." The co-defendant drove away from the scene, parked the vehicle in an empty driveway, and ran to his mother's home. He noted these locations were all less than five hundred feet from the scene of the shooting. The co-defendant heard a helicopter about thirty seconds after he entered his mother's home and when he looked out the window, he saw police blocking off the neighborhood. When the police arrived at Ms. Sanders's home, he surrendered.

The co-defendant stated the victim initiated the gunfire. The co-defendant was afraid and described the victim as having "a mad attitude, like he was aggressive or mad about something." He further testified that the Defendant did not fire any gunshots and did not possess a gun during the shooting. Rather, when the victim began shooting, the Defendant hid between the seats. Regarding the gun he used during the shooting, the co-defendant stated he last saw it "[f]alling out of the car," he did not have it when he entered the victim's vehicle, and he did not take it to Ms. Sanders's home.

The co-defendant acknowledged that he provided a statement to law enforcement on October 7, 2018, during which he was not "all the way truthful." More specifically, the co-defendant had denied any involvement in the shooting. During the interview, the co-defendant was "confused," felt "like [he] was being manipulated," and was scared because an officer threatened to seek an attempted murder charge against him. He denied that he said in his statement he was home all day and denied that the statement he was shown at trial was his, asserting that the statement he had given was signed. The video of the co-defendant giving a statement to law enforcement was played for the jury, and he agreed it showed that he did not sign the statement and that he asserted forcefully during the interview that he knew nothing about the crime and had not been involved.

During cross-examination by the State, the co-defendant faltered in his recitation of events leading up to his interaction with the victim. The co-defendant explained that prior to the shooting, he was at home with the Defendant and that they left to get

something to eat, to go to the tobacco store and a car wash, but also were just driving around. Questioned about inconsistencies in the relative locations he had given, the co-defendant could not recall when they stopped and stated that he only remembered that the victim followed them after making a U-turn.

The co-defendant admitted to firing approximately fifteen shots with what he believed to be a nine millimeter gun. He did not know whose gun it was, stating the gun was in Ms. Robinson's vehicle when he got inside. The co-defendant picked up the gun after the second bullet fired by the victim hit their vehicle. The State replayed the security footage, and the co-defendant acknowledged the Defendant got out of his vehicle at one point, which caused the vehicle to roll forward. The co-defendant, however, did not know what the Defendant was doing at the time.

The jury convicted the Defendant and co-defendant of aggravated assault and tampering with evidence related to law enforcement's inability to recover any weapons other than the victim's, and it imposed fines for each conviction. The trial court imposed concurrent sentences of four years for aggravated assault and three years for tampering with evidence for an effective four-year sentence, suspended to supervised probation after eleven months and twenty-nine days of service. The Defendant filed a motion for a new trial which was denied by the trial court. This timely appeal followed.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence supporting his convictions for aggravated assault and tampering with evidence. He also challenges the trial court's instructions regarding criminal responsibility. We conclude that while the evidence is sufficient to support the verdicts, the tampering with evidence conviction must be reversed because the jury instructions omitted the natural and probable consequences rule.

### I. Aggravated Assault

The Defendant challenges the sufficiency of the evidence supporting his conviction for aggravated assault, in particular asserting that the State did not negate self-defense. This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it

may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764.

In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The jury convicted the Defendant of aggravated assault for his participation in the shooting. As charged in Count 1, aggravated assault occurs when a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury" by using or displaying a deadly weapon. T.C.A. §§ 39-13-101 (a)(2), -102 (a)(1)(A)(iii).

The proof at trial, seen in the light most favorable to the State, established that the victim passed the Defendants in his vehicle and that the Defendants began to follow him, turning off the main road when the victim turned. The victim testified that the Defendant and co-defendant both fired shots at him, that he was afraid, that he exited the car and returned fire, and that he fled on foot. The victim called 911 prior to the first gunshots, and he cooperated in the investigation, assisting police in recovering his weapon. The victim's car was riddled with bullet holes which Officer Thomas testified could not have come from the victim's own gunshots. A rational trier of fact could have found that the Defendant intentionally or knowingly fired multiple gunshots at the victim which caused the victim to reasonably fear imminent bodily injury. T.C.A. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii).

The Defendant argues the State failed to negate his theory of self-defense, suggesting that the victim's testimony was insufficient to negate the theory as "there was no expert testimony, ballistic evidence, or other objective scientific proof as to who fired the first shot." "That the accused was acting in self-defense is a complete defense to an offense." *State v. Djuan Manning*, No. W2019-01625-CCA-R3-CD, 2020 WL 5587401, at *5 (Tenn. Crim. App. Sept. 17, 2020) (citing *Hawkins*, 406 S.W.3d at 128); *see* T.C.A. §§ 39-11-601, -611(b)(2) (establishing the statutory requirements for self-defense,

including a reasonable belief of imminent danger of death or serious bodily injury).  It is the State's burden to negate self-defense.  T.C.A. § 39-11-201(a)(3).  "Whether a defendant was acting in self-defense is a question of fact for the jury."  *Djuan Manning*, 2020 WL 5587401, at \*5 (citing *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012)).

The evidence at trial regarding which party initiated the gunfire ultimately presented a credibility determination for the jury.  The victim testified that the Defendants began to follow him and shot into his vehicle and that he only returned fire to protect himself.  The victim called emergency services prior to the eruption of gunfire, assisted in the investigation, and was "shaken" and "visibly offended."  The co-defendant testified that the victim stopped his vehicle and began shooting at the Defendants, prompting the co-defendant to seize the weapon of unknown origin and return fire.  The Defendants fled the scene with the victim's car, and the co-defendant denied involvement.  The physical evidence did not establish who fired the first shot. While the Defendant faults the victim for not driving away prior to the shooting and for exiting his car, the jury was entitled to credit the victim's explanation that he exited for his safety when a bullet penetrated his vehicle, and this testimony is not refuted by the video evidence, contrary to the Defendant's claim.  In reaching its verdicts, the jury clearly rejected the co-defendant's testimony, which supported the Defendant's theory that he acted in self-defense, in favor of the victim's testimony.  This court will not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Smith*, 436 S.W.3d at 764.  The Defendant is not entitled to relief.

## II. Tampering with Evidence

The Defendant asserts that the evidence is insufficient to support his conviction for tampering with evidence either as a principal or under a theory of criminal responsibility, and that the trial court erred in instructing the jury on criminal responsibility.  We conclude that, because the instructions were in error and because the State did not establish harmlessness beyond a reasonable doubt, the conviction for tampering with evidence must be reversed and the case remanded.

Tennessee Code Annotated section 39-16-503(a)(1) prohibits tampering with evidence:

(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress to:

(1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding….

T.C.A. § 39-16-503(a)(1).

The Defendant asserts that the proof merely shows abandonment rather than concealment of the weapon. The Tennessee Supreme Court has noted a "consensus" that "when a person who is committing a possessory offense drops evidence in the presence of police officers, and the officers are able to recover the evidence with minimal effort, discarding the evidence amounts to 'mere abandonment,' not tampering." *Hawkins*, 406 S.W.3d at 134. On the other hand, the element of concealment is satisfied when the defendant has acted "'to prevent disclosure or recognition of' a thing or 'to place [a thing] out of sight.'" *Id.* at 132 (quoting *State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010)). The Tennessee Supreme Court in *Hawkins* noted that there was no need to adopt a standalone abandonment doctrine because in cases of abandonment, the evidence would not actually be altered, concealed, or destroyed. *Id.* at 138. The *Hawkins* court concluded that the defendant in *Hawkins* had not concealed a firearm when he threw it over a short fence "into a location adjacent to the crime scene, where it lay in plain view and was easily found" because the defendant did not prevent disclosure or recognition of the weapon or place it out of sight. *Id.*

Here, on the other hand, no firearm was ever recovered, and the jury could have inferred that the evidence was placed out of sight, preventing its disclosure or recognition. The Defendant asserts that the very brief length of time – around ten minutes – during which the suspects were at large "would have made it impossible … to 'conceal' the gun rather than merely 'abandon'" it, but this contention runs afoul the facts of the case – that no weapons were found despite a search. Although the Defendant speculates that law enforcement failed to discover the weapon because they conducted an incompetent search, the record contains evidence from which the jury could have found that law enforcement searched the locations associated with the crime. This evidence included the extensive testimony regarding the condition of the two vehicles, the testimony regarding the casings recovered from the crime scene, the fact that law enforcement discovered and retrieved the security camera footage, the testimony that law enforcement established a perimeter and that the co-defendant observed them "blocking the streets off" within thirty seconds after he entered Ms. Sanders's home, the testimony that Ms. Sanders's home was only five hundred feet from the shooting, and the testimony that Ms. Sanders's home was searched pursuant to her consent. *See id.* at 136 (citing cases in which tampering convictions were upheld when a defendant hid or discarded a weapon while fleeing).

The Defendant asserts that there is no evidence that he ever possessed a gun and avers that he could only have been found guilty under a theory of criminal responsibility. He argues that there is "only one possible scenario," which is that the co-defendant

abandoned the acknowledged weapon at some point between the shooting and the time that the suspects were apprehended. However, the State presented evidence that the Defendant was armed with a gun, that the gun disappeared under circumstances in which a person would naturally be inclined to keep track of a firearm, that the Defendant remained within a few hundred feet of the crime scene, that the Defendant and co-defendant were aware that law enforcement were in pursuit, that the Defendant was only at large for approximately ten minutes, and that a search of the crime scene, vehicles, and home failed to unearth any weapon. Accordingly, there was evidence from which a rational trier of fact could have inferred that the Defendant, as a principal offender, concealed his weapon with the intent to impair its availability as evidence, knowing an investigation was in progress.

According to the Defendant, the co-defendant's actions are insufficient to support any conviction because the State did not prove that the co-defendant concealed the weapon rather than abandoning it and because the State did not show that the co-defendant intended to impair the weapon's availability as evidence. However, this court has previously determined that a reasonable trier of fact could have inferred that the co-defendant was guilty of tampering with evidence, that is, that he knew an investigation was pending and that he concealed the weapon with the intent to impair its availability as evidence. *State v. Djuan Manning*, No. W2019-01625-CCA-R3-CD, 2020 WL 5587401, at *5 (Tenn. Crim. App. Sept. 17, 2020); *see* T.C.A. § 39-16-503(a)(1). Pertinent to the analysis were the fact that the co-defendant acknowledged he had a gun, the fact that the co-defendant and Defendant were apprehended within ten minutes of the shooting at a location less than five hundred feet from the shooting, the fact that the co-defendant testified he was aware that law enforcement were in pursuit, the fact that the gun was never found despite evidence that law enforcement searched the scene of the shooting, the vehicles, and the home, and the fact that the co-defendant gave as an implausible explanation that he lost track of the gun during a shootout, circumstances under which a person would naturally be rather prone to keep track of a firearm. *Djuan Manning*, 2020 WL 5587401, at *6. The co-defendant further impaired his credibility by giving a statement to police in which he denied any involvement with the shooting. *Id.*

The Defendant asserts he is entitled to reversal of the conviction because the jury instructions regarding criminal responsibility were constitutionally infirm. The jury here was charged with criminal responsibility regarding both the aggravated assault and the tampering with evidence charges. A person is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). The Defendant asserts that the jury instructions erroneously omitted an element of the criminal responsibility charge which would require the State to prove that the offense was

the natural and probable consequence of the target offense of aggravated assault. The Defendant acknowledges that this issue was waived and requests plain error relief, which requires him to demonstrate that: a) the record establishes what occurred in the trial court; b) a clear and unequivocal rule of law was breached; c) a substantial right of the accused was adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

"The natural and probable consequences rule arose as a common law component of criminal responsibility and extends criminal liability to the crime intended by a defendant, and collateral crimes committed by a co-defendant, that were the natural and probable consequences of the target crime." *State v. Richmond*, 90 S.W.3d 648, 654 (Tenn. 2002). Criminal responsibility may apply when the criminal conduct differs from or exceeds the scope of the target crime. *Id.* at 655. The principle behind the rule is that offenders "should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). Whether a crime is a natural and probable consequence of the target crime is a question for the jury. *Id.* To demonstrate liability, the State must prove beyond a reasonable doubt: "(1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime." *Id.*

The pattern jury instructions include the following instruction for criminal responsibility:

> [A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt].

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 3.01. The Defendant is correct that the natural and probable consequences portion of the instruction on criminal responsibility was omitted.

A defendant has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). However, "the natural and probable consequences rule instruction is required only for incidental crimes and not for the target crime." *State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003). Regarding the aggravated assault conviction, there was evidence that the Defendant solicited, directed, aided, or attempted to aid the co-defendant to commit the offense, acting with the intent to promote or assist in the offense. The State presented evidence from which a rational trier of fact could have inferred that the Defendant, who had prior animosity toward the victim and was the driver of the vehicle, solicited, directed, aided, or attempted to aid the co-defendant in firing upon the victim by following the victim's car so that the co-defendant would have the opportunity to shoot into the victim's vehicle. There was no error in the instructions regarding aggravated assault, and the Defendant does not challenge this conviction on this basis.

To show the Defendant's criminal responsibility for the co-defendant's concealment of the co-defendant's weapon as a target crime, the State would have had to prove that the Defendant, with the intent to promote or assist the tampering, "solicited, directed, aided, or attempted to aid" the co-defendant to commit the tampering offense. *See* T.C.A. § 39-11-402(2). The record demonstrates that after the shoot-out, the Defendant and co-defendant immediately parted company, with the co-defendant stealing the victim's vehicle and the Defendant driving his girlfriend's vehicle to the vicinity of the co-defendant's mother's home. The Defendant parked at the home, while the co-defendant parked on a street running parallel to the street on which his mother lived. The two reunited in the home, by which point they could hear the helicopters circling. They surrendered shortly thereafter. In short, there is nothing in the record from which it could be inferred, beyond a reasonable doubt, that the Defendant solicited, directed, aided, or attempted to aid the co-defendant in concealing the co-defendant's weapon with the intent to impair its availability as evidence, particularly as the two were in separate vehicles until shortly before they were apprehended. The evidence would be insufficient to support a verdict under this theory, and the issue should not have been thus submitted to the jury.

If the tampering was an incidental crime to the aggravated assault and the Defendant bore criminal responsibility for the tampering offense by aiding the co-defendant in committing aggravated assault, then the jury should have been instructed that they must find that the tampering with evidence was a natural and probable consequence of the aggravated assault which Defendant solicited, directed, aided, or attempted to aid. The natural and probable consequences rule is "'an essential element that the State must prove beyond a reasonable doubt,'" and failing to instruct the jury on the rule is constitutional error. *Richmond*, 90 S.W.3d at 657 (quoting *Howard*, 30 S.W.3d at 277). When the trial court has committed constitutional error by failing to

instruct on the natural and probable consequences rule, the State must prove harmlessness beyond a reasonable doubt. *See id.*; *Howard*, 30 S.W.3d at 277 & n.6.

In this case, the basis of the jury's determination that the Defendant was guilty of tampering with evidence is not clear. Initially, we reject the Defendant's claim that "there was no evidence that [the Defendant] ever possessed a gun, fired a gun, or discarded a gun." While the co-defendant testified that the Defendant never had a gun, the victim testified that the Defendant was holding a gun and that the Defendant fired multiple shots at him. The video evidence did not, as the Defendant claims, disprove the victim's assertion that the Defendant shot at him. It is true that the video does not show the Defendant firing a weapon. It is equally true that the view of the area around the driver's door is almost entirely blocked by the leaves and bole of a tree. We find the argument that "there was no evidence that [the Defendant] ever possessed a gun" to be disingenuous, in particular the omission of the key detail that there is an obstacle to a clear view of the Defendant on the video and that the victim testified that he did not stop the car until after the first shot. The victim explained that while he may have been mistaken in his statement to police that the Defendant exited the vehicle to fire, he was certain that the Defendant and co-defendant were both shooting at him. The physical evidence regarding the number of weapons was inconclusive, in that Officer Thomas testified that the bullet holes in the victim's car were all made by either a .40 caliber or a nine millimeter weapon but that he could not distinguish between the two. Accordingly, the question of whether the Defendant had a gun, a prerequisite for culpability under a theory that the Defendant was convicted of tampering with evidence as a result of concealing his own firearm, was subject to dispute and was a question for the jury's determination.

Accordingly, the record does not reveal whether the Defendant was found guilty of tampering with evidence as a principal actor or through a theory of criminal responsibility. It is possible that the jury convicted him because it credited the victim's statement that the Defendant and co-defendant were both shooting and because it concluded that the circumstances warranted the inference that the Defendant, knowing that an investigation was in progress, concealed his own weapon with the intent to impair its availability as evidence. The jury may have inferred the Defendant was the principal in the offense based on evidence that he was armed with a gun, that the gun disappeared under circumstances in which a person would naturally be rather inclined to keep track of a firearm, that the Defendant remained within a few hundred feet of the crime scene, that the Defendant and co-defendant were aware that law enforcement were in pursuit, that the Defendant was only at large for approximately ten minutes, and that a search of the crime scene, vehicles, and home failed to unearth any weapon.

On the other hand, it is possible that the jury, persuaded that the victim may have been mistaken regarding the Defendant's being armed as the victim was admittedly mistaken regarding the Defendant's stance during the shoot-out, credited the proof that the co-defendant and victim were the only ones who were armed. In that case, the jury would have convicted the Defendant based on the erroneous jury instruction which omitted the natural and probable consequences clause. We note that although closing arguments were not included in the record, the prosecutor, during the motion for judgment of acquittal, stated that he intended to rely on the fact that "at least one firearm" had been concealed in relation to the tampering charge. The record clearly establishes that the jury instructions charging criminal responsibility for tampering with evidence were erroneous, and the Defendant's constitutional right to a correct and complete charge was violated. Because it is not clear if the jury convicted the Defendant based on the erroneous charge, we conclude that the State cannot establish harmlessness beyond a reasonable doubt.

Accordingly, because of the error in the instruction on criminal responsibility with respect to the tampering with evidence charge, the Defendant's conviction for tampering with evidence is reversed and the case is remanded for further proceedings.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court in part, reverse the conviction for tampering with evidence, and remand for further proceedings.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE